Okay, I think we've got everybody on, but we'll wait for Mr. Terry to get back. Okay, we're all set to go. Our last case for today and for the week is number 20-10276, Michelle Yates v. Pinellas Hematology & Oncology, P.A. Mr. Dixit. Good morning, Your Honors. Sean Dixit on behalf of Pinellas Hematology & Oncology. May it please the Court. Your Honors, the purpose of the False Claims Act is to punish unscrupulous contractors for providing fake or substandard products or services. The current action could not be more contrary to the stated purpose of the False Claims Act. Michelle Yates lost on all of her claims except for one on behalf of the U.S. government for $755.54 relating to the payment of 58 lab charges. However, the government now seeks to penalize and punish PHO for an additional 156 claims or charges, most of which were not false, and some of which, in particular, 18 charges were true. 18 charges had the missing CLIA number and had the Bayfront lab office address. An additional 21 charges were duplicate charges, nine charges were not related to blood work or non-CBC charges, and four charges were insurance non-Medicaid charges. Here, the government paid for cancer patients to get blood tests, and PHO provided those blood tests to real patients experiencing a real need for those tests in furtherance of their chemotherapy. There is no evidence that the blood test procedures violated any health or safety standards or regulations for the patients. Instead, the verdict was rendered on a technicality over whether there was an administrative error for a lab, a pre-existing lab with a CLIA license. Can I ask you a quick question? This is Judge Newsom. I mean, technicality, administrative error, I'm not sure. I mean, when you read these emails, it doesn't sound like administrative error to me. It just sounds sort of like book cooking, sort of like old-fashioned book cooking. You know, we're not going to get paid if these say A, so we need them to say B so that we can get paid. If you read those emails outside the context of the live testimony at trial, I can understand how you see that, but the testimony at trial was inconsistent with those emails, and it doesn't explain the true charges. We're lowering the false claim, the bar of proof, the burden of proof. For example, Michelle Yates, when I was cross-examining her, I asked her, so your testimony is your lab damages stop in July because you believe they stopped the billing department, only you and Leah stopped entering the CLIA number at that time. She said, I believe so, yes. I said, because then you figured out it was a mistake. She said, by then we knew something wasn't working correctly with it. Yes. So those emails are two billing clerks talking back and forth, trying to resolve a billing error while a CLIA-licensed lab is being transferred. And that's important. So you can't read those emails in a vacuum. Plus, emails should not be the lower standard of burden of proof for allowing true charges or non-false charges to be included under a verdict form where a jury is sort of being misled. There's a stigma that comes, Your Honor, with being called a fraudster or committing a fraudulent act in front of a jury. And realistically or practically speaking, it's almost like shifting the burden on the defendant to prove they're not false. And that's the problem here. The burden was shifted onto us when the plaintiff's attorneys were allowed to mislead the jury as to what they're calling fake or fraudulent lab charges. And that just became a snowballing problem. But Mr. Dixon, I understand your general position, but in other areas of criminal law, the provision of services without the right certification or license can be fraudulent at times. So what makes this case different? In other words, think of a real doctor who has a license in State A, moves to State B, doesn't get his license or her license there, but submits claims to Medicare or Medicaid for real services provided to real patients, but without having a license in the place where he or she was operating. What's the difference between that scenario and the scenario that PHA found itself in? Yes. To answer that question directly, the question is not would the government have paid for the claims for the unlicensed doctor or the unlicensed lab in this case. Because that's what the plaintiff's attorneys were arguing, that the government would not have paid for claims with an unlicensed lab or in your case, a doctor. The question here is, would the government have paid for sick cancer patients to receive blood tests necessary to start their chemotherapy if the blood test was performed at a licensed lab whose license had not been transferred yet? So in other words, to change your scenario a little bit, if I was waiting for, if a doctor was performing services, his license was pending, I was just waiting for my, really in your scenario, it would be a licensed doctor who's waiting for his NPI number or his billing number to actually start getting paid for his services. Your scenario is different from our scenario because we have a licensed lab, DMDPA. Well, he's got a license, but he doesn't have it in the new state. And to make the hypothetical closer to your case, he sends the bills indicating that the services were provided in his initial state, not in the new state that he's in. How is there a difference between those two scenarios? You're changing the facts of my case on me because in this case... I understand it's not your case. It's a hypothetical. So I want to understand what happens in the hypothetical. The doctor moves from Florida to Georgia. He's got a license in Florida, doesn't have a license in Georgia, provides medical services in Georgia, but in order to get paid, incorrectly or falsely states to Medicare that he provided the services in Florida. What happens there? Is that a false claim? If it met the other... I think, yeah, I would have to think if it met the other holistic measures that we're talking about. Because again, in your scenario, a false certification is a specific statement made to induce the government to pay you. So in your scenario, yeah, he has arguably the specific intent to make a statement that induce the government to pay you. The difference here in our cases, we need no false statement. How about the claims that change the place of the service? And that's a good point. A lot of those claims were missing the CLIA number. So they're not fraudulent. If I submit a charge without a CLIA number, the address becomes irrelevant. Because the government's looking at it and they're saying a CLIA number must match address. If they don't match, they don't pay. No CLIA number, they don't pay. Address without the wrong CLIA number, they were rejected. And now here's what's important, Judge. Fifty-eight team claims of the 58 that were paid were true. They missed, they did not have the CLIA number, and they had the Bayfront address. And why this is kind of esoteric is because you really have to get down in the weeds on the charges. Here's what's important. These charges are bundled with other Medicare charges. So for example, a HCFA form or explanation of VEDA form, which were not put in evidence, a summary was, those forms would have shown you, and I couldn't even show you on appeal because they weren't admitted, the HCFA forms would show you a lab test was bundled with a chemotherapy charge, was bundled with a nurse visit, was bundled with a doctor's visit. So Medicare is not accepting a lab charge by itself on a form, it's accepting bundled charges. And apparently through that process and the bundled charges, some lab charges that were true were paid, some lab charges that were not true were not paid. And it's a broad stroke, for example. And again, I focus on that was the fundamental error in this case because the jury was misled about it. Look at the questions that the jury asked. Those are critical. The two questions in this case is, the jury asked, what is the purpose, I'm sorry, what is the process to obtain a CLIA certification, including all associated costs, comma, timeframes, period. They also asked, can we assume that since Medicare did not pursue legal action, that no law was violated. So even the jury was confused because the problem is the bar, the evidentiary bar to bring these types of claims is not for a defendant to prove their truth, but for the plaintiff or the government to prove their falsity. And that bar was lowered in this case. To a certain extent, there is no argument about the law that was applied, meaning the holistic approach that Your Honors recently issued in that opinion two months ago, the Bibby case. There is no argument between the parties as to the law or the application of the law. Here, there's an argument as to the facts. I can drill it down to two important facts. Is the transfer of a CLIA license sufficient to violate the False Claims Act? And can true charges be counted as false charges? My time has expired, Your Honor, unless you have any questions for me. No, thank you very much. You've saved your time for rebuttal. Thank you. Mr. Terry. Sir, you're on mute. I apologize, Your Honors. May it please the court. My name is Scott Terry, and I represent the relator Michelle Yates in this case. And I want to start by responding to a specific point that Mr. Dixit raised, which was regarding the specific claims in the 214 claims. And Mr. Dixit repeatedly below and here says that there were claims that didn't have a CLIA number on it or various claims that had some issues that he contends would make them accurate. But I would I would point the court to docket entry number 222 on the record. This was fully addressed below. Every claim that Relator Yates included on her summary was a claim for a laboratory charge that was done at the Bayfront Laboratory that had the CLIA number from a separate laboratory where the work was not done. Every single one of those claims and the claims that Mr. Dixit has claimed otherwise were literally literally attached to docket entry number 222 and are part of the record. So, so I would first thing I'd like to do is try and clear up that factual dispute because, again, that was addressed below. And that would have been a powerful cross examination tactic if there's claims that are not included, that we could, if there's claims that were not that were not included that that would otherwise have been shown. So, again, I'd like to clear that up. So tell me again, you're saying that every single one of the 214 claims were claims that were performed at Bayfront with a CLIA number for a different entity. Correct. You're not a separate entity, a separate laboratory. So it was a laboratory that Penelope's Hematology operated, but the CLIA statute requires each laboratory to be independently and separately certified. So when when Medicare began rejecting the laboratory claims because they're being submitted without a CLIA certificate, Penelope's Hematology decided, well, rather than not get paid, we'll just go ahead and put the CLIA number from the separate laboratory on those claims. And Ms. Yates testified about this extensively, how she determined which claims were false, how she how she went through the data that was provided to obtain those claims. And each one of those 214 claims included the CLIA number for a separate laboratory that it did not include the CLIA lab. It did not have a CLIA for the proper laboratory. So each one of those was had actual false information that was submitted on the claim specifically to so that the United States would pay the claim. I'd like to address your honors. One of the one of the issues that has been raised in this appeal, which is the application of the Eighth Amendment to the False Claims Act penalties in this case. Obviously, that's an issue that has been raised. And one of the issues here is that the claims were relatively small. These were not high dollar charges. They were lab charges, which were small. But I don't think there's anything in the False Claims Act that eliminates liability or eliminates a penalty simply because of the claim that you submit smaller because your fraud is small. And this is the question, I suppose. Right. The question is not whether there's something in the False Claims Act that limits the penalty, but whether there's something in the Eighth Amendment that limits the penalty. I mean, it is a little eyebrow raising to to borrow a phrase from the punitive damages context, you know, where you've got a one point nearly $2 million fine on a $755 loss. Well, and your honor, I can see why at first glance you might that it might appear that way. But when you really dig into how the United States regulates behaviors, there's all kinds of things that the United States imposes very high penalties on that don't cause any economic damage whatsoever. And I cited a lot of those things in my brief, for example, flying an airplane without a proper FAA license gets you a $10,000 fine for each flight. Well, those flights may go off perfectly fine. No issues. No one has any problems on it. There's, of course, no economic damage whatsoever to the United States, but each one of those flights would still subject the pilot to a $10,000 per flight fine. And again, there's no economic harm so it's a little bit miss a little bit. It's a little bit challenging because the penalty really applies to the conduct. If the economic harm is greater, that's really addressed in the trouble damages, so that the higher the economic damage, the bigger the ultimate penalty is going to be. But really what this $5,500 fine is addressing is the conduct. And nowhere in his briefing does Penelas Hematology ever argue that a $5,500 penalty, which was literally half of what the statute would have provided is unconstitutional. They really try and look at it in gross and latch on to the small economic damage, but that's not really the issue. The issue is what they did and how many times they did it, and what the appropriate fine is for that particular act. And when you think about how diligently the United States has to govern it and monitor the thousands and thousands and thousands of claims that receives every day. A $5,500 penalty is not is not really shocking or I think even Congress didn't consider it high enough since they have since doubled the particular fine the particular minimum for that particular act. So there were no limits. If there are I don't believe they're violated in this case I'm, you know, presumably there's a hypothetical where, where there could be, I don't think with the constitutionally, I'm sorry legislatively enacted fine that provides a range of a high and a low. I don't think any fine on the low end of that scale would ultimately be an excessive fine under the Eighth Amendment personally. No matter what the low end is. No matter what the low end is again if that's a that's a congressionally mandated penalty for a specific act, and the defendant commits that act I believe that would be that that would be likely to be constitutional again, perhaps there's a scenario that you could come up with where it would be but I don't think that's the case here particularly when you look at the decision. Thank you. The walk in a tomb decision from this court very that this court very recently issued, where, where a district judge said that a $10,000 per transaction fine would be his constitutional limit for a money laundering scheme that caused no damage to anybody there was no fraud in the United States the defrauded bank was repaid with interest on each occasion so there was no economic harm whatsoever in that case, and the district judge said that a $10,000 per transaction fine would be his constitutional limit. And this this court reverse that look at that opinion and despite the fact that there was no economic harm whatsoever, no fraud against the United States, it said there's always harm with money laundering so that $10,000 per transaction minimum would not be the constitutional ceiling, and then a higher fine would be appropriate. And when you compare that to this case, where there was fraud against the United States. And the final is only $5,500 per transaction, it's hard, it's hard to make a connection with this would now be an unconstitutional fine. Your Honor, so I'm very limited on time, obviously. So I will, I will. I don't believe I have time to get into materiality argument, and obviously I know the United States has some time I believe that's an issue. That's an interest in their, their eyes. So I would ask that the court firm I believe that the jury got this one right I believe that the trial trial judge got it right. And I believe this kick this case should be affirmed. Thank you. Thank you, Terry. Is it she. Yes, that's right, Your Honor. Okay, Mr she go right ahead. Thank you very much. May it please the court, Mike she for the United States. I want to take a step back to emphasize the extraordinary nature of the relief that defendant to seeking today. Defendant is asking this court to overturn a jury verdict, specifically finding that it's lies about it's clear status were material. Now this court's precedents make clear that that's permissible, only if the trial record construed in the light most favorable to the verdict points overwhelmingly in favor of reversal, and this record contains plenty of evidence supporting this jury's finding. Indeed, as Judge Newsome mentioned earlier in the argument defendants of billing specialist said to her employees that for any denial we receive, quote, we change the place of address and refile to Medicare, that way we can get the lab paid. So based on all of this evidence a jury could rationally find that defendants falsehoods had a natural tendency to influence or were capable of influencing CMS is payment decisions. And so for that reason the district court correctly denied the motion for judgment notwithstanding the verdict. I think defendants case this case just you may be right on the law and given the standards of review that we need to apply. But this case just doesn't feel like a normal key Tam false claims that case in some ways. First, because of the, the huge gulf between the actual economic loss and the amount of fines imposed. And then because Miss Yates was involved to some degree in some of the chicanery. She may not have created it she may not have organized that she may not have thought of it, but she was partly partly involved in carrying it out. And so it just doesn't feel like the normal false claims that case. I'd like to take both points in turn your honor so with respect to the first point about how there is this disparity between damages, and the penalty. I think the Fourth Circuit's decision in the bunk cases illustrative. So in that case there was an antitrust conspiracy to charge the government higher than market rates for shipping service members goods across Europe. Now in that case the key tamber later didn't even request monetary damages didn't even attempt to prove how much economic loss the United States was going to suffer, and didn't make any showing about how much money the government actually lost from this antitrust scheme, and the government also indisputably got the services that it paid for the goods of the service members were actually delivered. Yet the Fourth Circuit upheld afford a $24 million penalties judgment under the False Claims Act, rejecting every single one of the arguments that defendant raised here, and I think that makes sense for a couple of reasons. First, it makes sense because the whole point of the False Claims Act is not simply to penalize actual economic damages against the government. It's the sad fact that fraud is difficult to detect and fraud against the United States in the context of massive governmental schemes like Medicare and Medicaid is even harder to detect. So unfortunately the government just simply isn't able to catch everything, despite dedicating a ton of resources to doing so. And so the penalty provisions, help deter misconduct, and also help compensate the government for the fraud that we do catch. And they're also there to encourage key tamber leaders to come forward. And this gets to your second point, Your Honor, the relators are oftentimes whistleblowers from within the company who know of the fraud in virtue of being there on the ground. And the reason Congress enacted the key tamper vision was because they know that the government is an easy mark and fortunately we just don't have a ton of visibility into the inner workings of a lot of these schemes. And so we rely on relators to come forward and to tell the truth about what they witnessed. And so, you know, to the extent that that is relevant to the damages calculation, a court is of course more than able to take that into account, but that's precisely what the district court did here. The other thing I want to... So are there, in your view, Mr. Shih, are there any Eighth Amendment limits to fines imposed under the False Claims Act? Yes, Your Honor. So we don't dispute that the Eighth Amendment applies with full force to the penalties provisions of the False Claims Act. But we will note that this court's precedents make very clear that there's a strong presumption that judgments that fall below the statutory maximum are constitutional. And we're aware of no case from this court or indeed any court of appeals holding that a False Claims Act judgment that fell not only below the statutory maximum, but indeed at the statutory minimum was unconstitutionally high. And the other side certainly hasn't cited one in its briefing. And again, I would go back to the bunk case where all of these arguments were presented to the Fourth Circuit and for the reasons that I described, the Fourth Circuit rejected them. The Supreme Court's decision in Badgerkadzian is also... And in Waddinghouse? Thank you very much. The decision in Badgerkadzian is also instructive because there the court made clear that the decision of what penalties to apply rests in first instance with the legislature. And that's because a judicial determination about the gravity of an offense is necessarily imprecise. So a judgment is constitutional, not if it bears some strict mathematical relationship between actual damages on the one hand and the penalty on the other hand. But so long as it just has, quote, some relationship to the gravity of the offense that the penalty is designed to punish. And in light of that very generous standard, and in light of the expertise that Congress has, I think that's why this court and other courts have been reluctant to hold that minimum penalties judgment under the False Claims Act is unconstitutional. But what was the disparity in Badgerkadzian? I think the disparity was also mathematically significant, Your Honor. But again, I don't think that that's the appropriate way to think about these cases. And the Supreme Court has rejected the idea that the Eighth Amendment can be reduced to a mathematical ratio. They rejected that in Badgerkadzian itself. I know, but Badgerkadzian also sort of indicated that the full amount of a forfeiture judgment is not insulated from Eighth Amendment review just because Congress authorizes it, right? I agree, Your Honor. Badgerkadzian did hold that. But my understanding was that the penalty at issue in Badgerkadzian exceeded what Congress had put in place. So the forfeiture was higher. And so this presumption that we've been talking about just didn't apply there. But I think another instructive case is this court's chaplain's decision. That was a crime involving only $22,000, and the forfeiture imposed was about $2 million. And the court—I see my time has expired, if I may. Yes, please finish up. Of course. In chaplains, the court nevertheless held that a forfeiture of $2 million fell well within the range of permissibility under the Eighth Amendment. So for all of those reasons, we urge the court to affirm the judgment of the district court and uphold the penalties. All right. Thank you very much, Mr. Cheat. Thank you very much. Mr. Dixit, you've got your four minutes of rebuttal. Thank you. Thank you. Sorry. Thank you, Your Honor. I'd like to break up the two issues. I'd like to address the materiality and then the Badgerkadzian argument. First, with regard to materiality, where I want to end is on this. All of the cases relied upon by the government and the plaintiffs are cases that involved crimes or true frauds, all of them, every single case. Can I ask you a quick question? So the government says, as I recall in its brief, that it's not aware of a single case in which judgment as a matter of law has been granted over a jury verdict on a materiality issue. Are you aware of any? Not post judgment. But again, that's why I argued the charges. The charges were a fundamental error to allow true charges to be called false charges, because what happens as a practical matter in court, you get compromised verdicts all the time. And I'm convinced in this case, the jury didn't want to find retaliation. Miss Yates was arguably terminated in an awful way with a bare minimum wage paycheck on her last day. And I believe that upset the jury, that upset at least one of the jurors. But the jurors don't understand that when you find false claims that damages because the jury instructions tell them there are no punitive damages, there are no excessive damages added on top of that. They left her $755.54 as a tip, basically representing her last paycheck. But there's not what's more important, Your Honor, is my argument is that there's not a single case cited by the government or the plaintiff that finds a false claims act for the failure to file a form. I cited Demi, I cited Spey, I cited Hobbs. Those were all federal cases in which a failure to file a form or to participate was found not to be a false claims act. So in other words, my case, this case should not even gone to the jury. That's what I'm arguing. And so sure, I can't find a case post judgment verdict because there isn't one. They don't go to trial. For some reason, my case did. Now I want to end on this, on the Bajikashian argument, I want to give some attention to that if we're done with the materiality argument. I want to start with the judge's statements in the trial court because I think that is incredibly important. Plaintiff's counsel and the government act as if the judge did an Eighth Amendment analysis and it should be upheld. And that's not true. The trial judge said this, Judge Jung said this, here, the government did not pay many of the false claims and the sum total of actual damages is very small. This equitable argument also has support because the claims did not involve fake tests or fake patients. Instead, the test came from a lab that had no proper license and Medicare would not pay for lab reports from a non-licensed lab. Providing this level of penalty on such a small amount of actual damages is quite harsh. Nevertheless, this is a legislative mandated penalty. The court believes it is bound by 11th Circuit precedent to impose this very harsh penalty per claim. So in other words, the trial judge never did analysis, never had an analysis under Bajikashian to determine the grossly disproportional damages to the gravity of the defendants in defense. That's the essence of Hatem, the recent case that came out of this court late last year. So the judge's quote shows that he never got the chance to show the extent of the harm caused, the gravity of the offense, whether it was related to other additional illegal activity. Again, these are lab charges in a vacuum and they were bundled with other charges and there was no other related legal activity and the availability of other penalties. Counsel, your time has expired. Your Honor, I ask that the court vacate, reverse, and remand in light of this argument. Thank you. All right, Mr. Dixit, Mr. Shih, Mr. Terry, thank you all very much. It was helpful. That concludes our session for the week and we stand in recess. Thank you.